Marvin JONES, on his own behalf and
on behalf of those similarly situated,
Plaintiffs-Appellants,

v.

Fred R. DIAMOND et al.,
Defendants-Appellees.

No. 78–1289.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1981.

David M. Lipman, Miami, Fla., John L. Walker, Jackson, Miss., for plaintiffs-appellants.

Charles S. Ralston, Steven L. Winter, New York City, amicus curiae for NAACP Legal Defense and Educational Fund.

Raymond L. Brown, Pascagoula, Miss., for defendants-appellees.

Before COLEMAN, Chief Judge, BROWN, AINSWORTH, GODBOLD, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK, Circuit Judges.[*]

ALVIN B. RUBIN, Circuit Judge:

Prisoners confined in the Jackson County jail in Pascagoula, Mississippi, either awaiting trial or already convicted, contend that conditions and practices in that jail violate federal constitutional guarantees,[1] including the equal protection and due process clauses of the fourteenth amendment, the freedom of speech clause of the first amendment and the cruel and unusual punishment clause of the eighth amendment.

Asserting a class action claim under 42 U.S.C. § 1983, they seek declaratory and injunctive relief. The original complaint also sought compensatory and punitive damages on behalf of all members of the class, a group later estimated to include more than 8,500 persons. After trial on the merits, at which there was testimony about the individual complaints of ten class members, an amended complaint was filed asserting pendent damage claims for violations of Mississippi state law. Two panels of this court have heard prior interlocutory appeals[2] and, after trial and consideration of the merits by another panel,[3] we have heard the case en banc. The scope and variety of the claims presented require us to review each of them separately. We first set forth the basic constitutional principles governing conditions of confinement in state prisons and the history and facts of this case. After examining each of the varied claims and the defenses offered, we conclude that the conditions of confinement in the jail violated constitutional guarantees and that the prisoners as a class are entitled to injunctive relief. We conclude that the class representative is not entitled to damages, and we affirm the district court judgment denying him damages as well as the judgment denying six of the individual plaintiffs damages under Mississippi state law. Because the record does not demonstrate that any of the four other individuals who testified was asserting individual damage claims under Section 1983 and does not adequately support those claims had they been asserted, we modify the judgment as to the claims of those four individuals and dismiss them without prejudice. We further affirm the judgment of

---

[*] Judge Goldberg, who participated in the oral argument of this case, took senior status as of January 31, 1980 and is therefore no longer qualified to be a member of the Court en banc. Circuit Judge Jerré S. Williams has become a member of the Court since this case was taken under submission. He elects not to participate in the decision.

1. We have in the past heard a number of cases involving prisoner grievances. *See, e. g., Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977); *New-*

man v. Alabama*, 559 F.2d 283 (5th Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974).

2. Only one of these decisions is reported: *Jones v. Diamond*, 519 F.2d 1090 (5th Cir. 1979).

3. *Jones v. Diamond*, 594 F.2d 997 (5th Cir. 1979).

the district court in some matters discussed in detail below.

## I. CONSTITUTIONAL REQUIREMENTS

Judges are neither correctional officers nor penologists. Even if we had the expertise to analyze the practical and theoretical implications of the conditions of incarceration, we would have no warrant to impose our views, for a legislature—state or federal—is not required by the Constitution to operate penal institutions in accordance with criminological doctrine or to employ only experts in their management. We are mindful that "courts are ill equipped to deal with the increasingly urgent problems of prison administration . . .," *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224, 235 (1974), and that it is not "wise . . . to second-guess the expert [or any other] administrators on matters on which they are better informed," *Bell v. Wolfish*, 441 U.S. 520, 531, 99 S.Ct. 1861, 1870, 60 L.Ed.2d 447, 463 (1979) (quoting lower court opinion). Moreover, we are aware that we should not, "in the name of the Constitution, become . . . enmeshed in the minutiae of prison operations." *Id.* at 562, 99 S.Ct. at 1886, 60 L.Ed.2d at 483.

These constraints do not mean, however, that we should return to "a time not too long ago when the federal judiciary took a completely 'hands-off' approach to the problem of prison administration," *id.* at 562, 99 S.Ct. at 1886, 60 L.Ed.2d at 483. A prisoner, whether already convicted of a crime or merely awaiting trial, does not shed all his constitutional rights when he puts on jail clothing. While our "inquiry . . . into [state] prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution," *id.* at 562, 99 S.Ct. at 1886, 60 L.Ed.2d at 483, it is our duty, when jurisdiction is properly invoked, to protect prisoners' constitutional rights, for "[t]here is no iron curtain drawn between the Constitution and the prisoners of this country," *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974).

Among the constitutional safeguards extended to all prisoners, including those convicted of a crime, are: protection by the equal protection clause of the fourteenth amendment against invidious discrimination on the basis of race, *see Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); religious freedom by the first amendment, *see Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); security against deprivation of life or property or additional deprivation of liberty without due process by the fourteenth amendment, *see, Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); freedom of speech by the first amendment, *see Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and protection by the eighth amendment from cruel and unusual punishment, *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In determining whether conditions of confinement are unconstitutional under the eighth amendment or the fourteenth amendment, we do not assay separately each of the institutional practices but look to the totality of conditions. Our task is limited to enforcing constitutional standards rather than assuming superintendence of jail administration. *See Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977).

The due process clause accords pretrial detainees rights not enjoyed by convicted inmates. While a sentenced inmate may be punished in any fashion not cruel and unusual, the due process clause forbids punishment of a person held in custody awaiting trial but not yet adjudged guilty of any crime. *Bell v. Wolfish*, 441 U.S. 520, 575, n.16, 99 S.Ct. 1861, 1872 n.16, 60 L.Ed.2d 492 n.16 (1979). However, incarceration of pretrial detainees, whether or not so intended, necessarily imposes restrictions on them. Absent an expressed intent to punish on the part of prison officials, such a restriction is valid if "an alternative purpose to which [the restriction] may rationally be connected is assignable for it" unless "it appears excessive in relation to

the alternative purpose assigned [to it]." *Id.* at 538, 99 S.Ct. at 1873, 60 L.Ed.2d at 468 (quoting *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963)). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539, 99 S.Ct. at 1874, 60 L.Ed.2d at 468 (footnote omitted).

With further elaboration when necessary, we apply these principles to the complaints concerning the Jackson County jail.

## II. HISTORY OF THE LITIGATION

The Jackson County jail was built in 1949. In 1971 the Pascagoula newspaper, The Mississippi Press, ran a series of articles about deplorable conditions in the jail. The series, at least in part, prompted the Board of Supervisors to propose, and the electorate to approve, a bond issue to build a new jail. The Board of Supervisors dedicated half of the bond issue to construction of a juvenile facility, which was completed in 1975. However, an architect had not yet been employed and construction of the new jail had not begun when, in August 1973, this suit was brought as a class action under Section 1983 on behalf of persons confined in the Jackson County jail against the sheriff of the county, Fred Diamond, the jailer, Roy Tootle, Sr. and members of the County Board of Supervisors. In January 1976 Sheriff Ledbetter replaced Sheriff Diamond and Jack Broadus, Sr. was appointed jailer

by the new sheriff.[4] The new administration made various changes that somewhat ameliorated jail conditions. Plans for the new jail were drawn in 1975, but construction began only a considerable time thereafter because the county sought and eventually obtained aid from the Law Enforcement Assistance Administration [LEAA]. The new jail was not occupied until February 1979,[5] some months after the appeal from the trial court's 1977 decision had been heard by a panel of this court.

In a separate action, a federal district court, affirmed by this court in 1974, found conditions at the Mississippi State Penitentiary at Parchman violative of the federal constitution and limited the number of inmates who could be confined there.[6] This resulted in the detention of some state prisoners at county jails, including the Jackson County jail. By the time this case was tried, the Jackson jail was being used to confine a substantial number of persons who had been convicted of felonies and sentenced to serve terms in the state penitentiary, some who had been convicted and sentenced to serve terms in the county jail, some who had been convicted of municipal offenses and a substantial number of pretrial detainees—persons charged with crimes and awaiting trial who were not eligible for or not able to provide bail.

Soon after the suit was filed, the trial judge denied certification of a plaintiff class and dismissed some of the defendants. Following an interlocutory appeal, we ordered a class hearing and reversed dismissal of the Board of Supervisors as a defendant. *Jones v. Diamond,* 519 F.2d 1090 (5th Cir. 1975). After more than three years had elapsed from the time the suit was filed, the trial judge in February 1977 certified a class of "all persons who were incarcerated

---

**4.** Counsel have informed us that both Diamond and Broadus are deceased.

**5.** By stipulation of the parties, factual data concerning events subsequent to the trial were made part of the record in December 1979, so we know that the new jail was put into use on February 15, 1979. An affidavit filed by Sheriff Ledbetter states that the old jail is being used

"as temporary holding cells for persons who will be held in jail for just a matter of hours." Counsel for the defendants also stated that the old jail's facilities are being used for municipal prisoners of the town of Pascagoula, whose jail was destroyed by a hurricane in 1979.

**6.** *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss. 1972), *aff'd,* 501 F.2d 1291 (5th Cir. 1974).

at the time of the filing of the complaint, or are now, or in the future will be confined in the Jackson County jail, either to serve a sentence or awaiting sentence ...." At the same time, defendant classes were certified, consisting of the successors to the positions of sheriff and jailer and members of the Board of Supervisors.

Trial on the merits began in February 1977 but, after four days of testimony, was recessed until June. In August 1977, the trial judge in a five-page opinion denied both injunctive relief and damages to Marvin Jones, one of the prisoners. The judge held the class claims in abeyance, apparently pending completion of the new jail, which his opinion stated would be "ready for occupancy in about a year." By then, this suit for injunctive relief had already been on the docket for four years. The plaintiffs again sought relief from this court, and in November 1977 we directed the judge to rule on the merits of the class claims. In December he entered his findings.

The trial judge found against the plaintiffs on all the facts and concluded, "[s]ince constitutional violations are not involved, this court will not intervene in the orderly function of the Jackson County jail. The Federal judiciary maintains a policy of minimum intrusion into the affairs of local jails and prisons...." Then, without explaining the apparent anomaly, he stated, "The Jackson County jail is inadequate and should be promptly replaced or supplemented.... There should, however, be a reasonable time frame imposed for its completion." He observed that the assignment of prisoners to cells should not be made on the basis of race. Although he found no violation of prisoner rights in the methods used to impose discipline, he added that due process should be accorded prisoners for whom "major or severe" punishment is contemplated. He ordered rules for disciplinary actions to be posted and granted any prisoner with a claim for violation of those rules the right to have his case considered by a United States Magistrate. Finally, he denied any damages but retained jurisdiction to "alter and/or modify" any part of his ruling "from time to time."

Simultaneously, the trial judge issued a preliminary injunction. It ordered the defendants "to complete their new jail, with all equipment in place, ready for use and operation on or before September 15, 1978." It also ordered the defendants to refuse to accept prisoners charged with misdemeanors by municipalities, required them to post a list of prisoner rights prepared by the court and enjoined them from requiring or allowing any prisoner "to sleep on any mattress on the floor ... and the jail shall not be overcrowded to such extent as to require such incident."

The trial judge's conclusions, his injunction and his retention of jurisdiction are not mere nonsequiturs; they reveal that the judge, who had become thoroughly familiar with this case over a period of four years, really was aware of constitutional violations. Absent proof of such violations he had no jurisdiction, in his own words, to "intervene." While this does not of itself determine the incorrectness of the inconsistent findings of fact, it is not inconsequent to their evaluation. Having reviewed the entire 1520-page transcript and the remainder of the record, we find that the part of the trial court's opinion styled "Findings of Facts" contains many findings that are clearly erroneous concerning conditions in 1973, when the suit was brought, and, in many respects, equally so as to those prevailing in 1977, when the trial finally occurred. See Fed.R.Civ.P. 52.[7]

---

7. Because we conclude that the findings are clearly erroneous, we do not consider the standards for review of constitutional facts. A number of federal circuit courts have qualified the clearly erroneous rule when reviewing constitutional facts found by federal trial courts. See Cousins v. City Council, 466 F.2d 830, 837 (7th Cir.), cert. denied, 409 U.S. 893, 93 S.Ct. 85, 34 L.Ed.2d 151 (1972); Guzick v. Drebus, 431 F.2d 594, 599 (6th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231 (1971); United States v. Baker, 364 F.2d 107, 110 n.4 (3d Cir.), cert. denied, 385 U.S. 986, 87 S.Ct. 596, 17 L.Ed.2d 448 (1966).

## III. FACTS

The Jackson County jail occupies part of the four-story Jackson County courthouse in the center of the city of Pascagoula. The sheriff's office and other law enforcement facilities are located on the first floor of the building, together with one cell called the "holding cell." The jail kitchen and an apartment for the sheriff are located on the third floor. The top floor contains two large cells called "bull pens" (one with thirty bunks, the other with eighteen), several four-bunk cells called "line cells," a maximum security cell, a trusty room, service facilities and two cells used for the confinement of mentally disturbed and violent persons generally called "padded cells" (although they had no padding) or termed "the hold" by prisoners.[8]

The trial judge made few findings concerning jail conditions as they existed in 1973, as compared to those existing at the time of trial in 1977. However, the testimony, particularly in many instances that of Sheriff Diamond and Jailer Tootle, and the defendants' answers to interrogatories warrant the following conclusions concerning conditions when this suit was commenced.

Jailer Tootle was the only person directly charged with responsibility for jail administration. He usually was on duty from 8:00 A.M. until 5:00 P.M. and was off duty one day a week. When he was present in the jail, most of the details of administration were handled by prisoners who had been selected to act as trusties; when he was not present, prisoner-trusties were, as a practical matter, in sole charge. The trusties carried keys to the cells, relayed medical complaints to the jailer, delivered packages and administered the jail canteen.

The jail had 76 bunks. Even with that number of inmates confined, it was badly crowded. Generally, however, it housed many more. There was evidence that an average of 197 persons passed through the jail each day. Not all of these remained overnight because many would post bond and be released the same day. How many prisoners were confined at any one time during the day or on any given night cannot be determined from the jail records because only admissions and discharges were recorded. The defendants offered evidence that the average number of meals served each day ranged from 82 to 97. On one day 102 persons were confined. There was, moreover, voluminous testimony by prisoners, confirmed by other testimony and apparently credited by the trial judge, that prisoners were often required to sleep on mattresses on the concrete floor and on the day-room tables. At times there was as little as six to eight square feet of space per prisoner.

There was absolute conflict in the testimony about sanitary conditions. Many prisoners testified that the jail was overcrowded, people slept on the floors and on tables, mattresses were soiled and dirty, mattress covers, when supplied, were filthy and jail conditions were unsanitary. On the other hand, Sheriff Diamond and Jailer Tootle testified that rarely, if ever, did the number of prisoners exceed the number of bunks, mattresses were replaced regularly, mattress covers were washed regularly, there was a daily cleaning of the cells under the trusties' supervision and the jail was maintained in a sanitary condition. Photographs and other evidence satisfy us that the prisoners' account of the jail more accurately described conditions, at least at the outset of the suit, than the account by the sheriff and jailer and that the district court was clearly erroneous in reaching the conclusions it did.

The former Chief of Classifications and Parole of the United States Penitentiary at Terre Haute, who had also served as Superintendent of Lorton Correctional Institution in the District of Columbia, visited the jail

---

8. Each "padded cell" was 6'6" by 6'. Although the cells were not padded, there were places where mattresses could be installed to serve as padding if needed. Sheriff Diamond testified he knew of no instance when they had been used. These cells had no bunks or any other furnishings. Each had a hole in the floor that served as a urinal. If the confined person had other needs, he had to call a trusty.

just before the trial, long after Sheriff Ledbetter had succeeded Sheriff Diamond and further changes had been made. His testimony [9] and the testimony of another expert who visited the jail at the same time [10] satisfy us that, while some of the worst conditions were ameliorated after Sheriff Ledbetter took office, even in 1977 the jail was filthy, inhumanly overcrowded and unsuitable for the confinement of prisoners.[11]

Jailer Tootle administered punishment by confining persons, if their offense was "serious enough," in the "padded cell" and by restricting their visitation privileges. There were rudimentary jail rules posted but punishment for violations was inflicted at Tootle's discretion without a hearing of any kind.

Although the district judge found that there was no pattern or practice of sexual abuse in the jail, Jailer Tootle testified that during the Diamond administration the prisoners held a kangaroo court in the bullpen and, in answer to interrogatories, said of a prisoner, "Judged at kangaroo court in bullpen. Sentence *on every new inmate put in bullpen* after trial, such as unnatural intercourse and make them [perform a homosexual act]. Also beat up several inmates pretty bad." (Emphasis supplied.)

He testified that he had received reports of many sexual assaults but that he could prove the occurrence of only one because the victims of the other attacks refused to testify against their assailants. Jailer Tootle also testified that there were always fights in the jail. The evidence, taken as a whole, leads us to conclude that, during the Diamond administration, the jailers failed to take charge of the jail, entrusted it to the trusties' supervision, knew there was a climate of prisoner violence and failed to take any steps to eliminate it.

When Sheriff Ledbetter took charge in 1976, he employed an assistant jailer to serve when the jailer was off duty, thus providing twenty-four hour a day supervision. However, the trusty system was maintained and prisoner abuse of other prisoners was not eliminated. There continued to be repeated fights in the jail and a general climate of violence.

While the district judge found that there was "no pattern or practice of racial discrimination in the jail," he also found that "on occasion" prisoners who were to be confined to one of the two bullpens, which housed more than half the prisoners, were given a choice between the two. Sheriff

9. John O. Boone testified, "[T]hat jail is against all my notions of justice.... I'm appalled and I think it's devastating for everybody, for the officials; especially for the officials especially, and for the prisoners, and I can't see how anybody can get a notion that anybody has a good feeling about justice having had any kind of relationship to that jail." He testified about sanitary conditions, "I saw stacked up piles of filth.... Paper plates, paper cups, dirty towels, dirty clothes.... The men were dirty." After an objection to hearsay concerning bathing facilities, he stated, "Well, I smelled them.... I smelled them and I saw the dirt. One young man was rubbing the dirt off his skin." He testified that one shower area was unidentifiable *"until they told me that's what it was.* It was extremely dirty, corroded .... It's absolutely an impossible sanitary situation."

10. Theodore James Gordon had extensive experience as a health care facility surveyor and in institutional hygiene. He testified that some showers were full of trash and garbage because there was no place to sweep out the trash. Four prisoners were confined in the two-person cells. The ventilation system was not working.

The institution provided no linen and no clothing for prisoners. There was no way prisoners could wash their clothing except in showers which were not then working. There were laundry facilities on the first floor, but they were not being used. He saw inmates sleeping on the floor on dirty mattresses with "evidence of urine stain; where someone had thrown up on the mattress at one time or another. They were soiled and were not cleaned at all."

11. In 1976 a jail riot occurred in which $30,000 of property was damaged, although no one was injured. Needless to say, jail conditions do not excuse disorder and we do not condone the rebellion in any way. After the riot, when interviewed by the Mississippi Press, Sheriff Ledbetter was quoted as saying that the persons in the jail were jailbirds and "they don't have any rights as far as I'm concerned." Interrogated about this during trial, he did not deny the statement. This casual observation is of some importance in evaluating the sheriff's testimony and his view of his responsibility as official custodian of the prisoners.

Diamond testified that "a large part of the time they [the bullpens] were segregated and one was known as the white bullpen, the other as the black bullpen." Although counsel for defendants argued that racial segregation was eliminated by Sheriff Ledbetter, Ledbetter himself testified that he continued "freedom of choice" and that this resulted in segregation in the bullpens.

On admission every prisoner was presented with, and usually signed, a card that gave the jailer the right to censor mail. Later, Jailer Tootle said, he "scratched out 'censor' and put 'search' on the card." Mr. Tootle opened incoming mail if he was suspicious of its contents. He testified that he did so only once. On the other hand, Sheriff Diamond testified that incoming "bulky" letters and all packages were examined by Mr. Tootle. It appears that mail censorship was considerably reduced after Sheriff Ledbetter took office, but he and his jailers continued to some extent to intercept mail as they saw fit.

Situated as it was on the top floor of a building on a downtown street corner, the jail had no facilities for outdoor exercise and, because it was overcrowded, no room for indoor exercise. The jailers testified that prisoners could and did do push-ups as their only form of exercise in the jammed cells and day rooms.

There was extensive testimony about the ventilation, diet and medical care. The plaintiffs offered considerable evidence that all were deficient. The defendants offered testimony that all were adequate. We do not relate this evidence at length because we evaluate conditions at the jail in sum and do not consider the adequacy or inadequacy of any particular aspect of prisoner treatment controlling.

## IV. CONSTITUTIONAL VIOLATIONS

### A. Segregated Facilities

■ At least 48 prisoners—those in the two bull pens—were segregated by race with the explanation that this was the result of their choice. In prisons, where hostility of every kind is rampant, freedom of choice is but a gauze for discrimination. In the inherently coercive setting of a jail, the failure of officials properly to supervise their wards is an abdication of responsibility. A black person newly admitted to the crowded jail and ordered to choose between confinement in a cell crowded with white prisoners, some convicted of major felonies, could hardly find the "choice" to be aught but illusory. A white prisoner would be equally unlikely voluntarily to enter a cell full of black prisoners in preference to one occupied by whites. The defendants do not suggest any justification for the policy. While it was disguised in terms of choice, the practice was racially discriminatory and, hence, unconstitutional. *See Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

### B. Cruel and Unusual Punishment

■ Confinement in a prison where terror reigns is cruel and unusual punishment. A prisoner has a right to be protected from the constant threat of violence and from sexual assault. *Withers v. Levine*, 615 F.2d 158 (4th Cir. 1980); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974); *Woodhous v. Virginia*, 487 F.2d 889 (4th Cir. 1973). While in our ultimate conclusion we consider the jail conditions as a whole, some specific facts assist in our evaluation. Prisoner abuse by other prisoners was common. During the Diamond administration, prison management was in effect turned over to trusties fifteen to sixteen hours a day. Deputies were on duty downstairs but, apart from occasional patrols, they had no knowledge of events in the jail and could not be summoned by prisoners. The evidence satisfies us that there was constant violence, and, at least during part of the period, a prisoner-run kangaroo court that inflicted physical and sexual abuse on other prisoners. This state of affairs was known to Jailer Tootle and to Sheriff Diamond.

The old jail was grossly overcrowded. The trial judge in fact found this to be the case, and, indeed, this was the principal reason the new jail was built. In the daytime, prisoners were confined to the day

room in such numbers that at times there was little more than six square feet per inmate. The west bull pen held eighteen inmates (in three six-bunk cells), and had only eleven square feet per person, including space occupied by tables. Conditions in the east bullpen, which held thirty inmates (five six-bunk cells), were worse and sometimes during the day there was only 6.8 square feet of space per person, including table space.

Mattresses, at least at the start of the suit, were allowed to become filthy. Prisoners often slept on mattresses laid on the floor or on tables in the day room. Under the crowded conditions the jail was stifling in the summer. Diet, while minimally adequate, consisted mainly of starches and was not balanced. There was no outdoor exercise. Prisoners who did not wish their bodies to waste away could only do push-ups in the crowded corridors or packed cells.

■ The combined impact of these conditions made confinement in the Jackson County jail of any prisoner cruel and unusual punishment and the confinement of pretrial detainees punishment per se.

### C. Prisoner Protection

■ When prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners and the level of violence has become so high that exposure to it constitutes cruel and unusual punishment, we have approved orders to develop a classification system as part of an effort to eradicate those conditions. *McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *Gates v. Collier*, 501 F.2d 1291, 1308–10 (5th Cir. 1974). The constant and habitual exposure of convicted prisoners to persons who are contagiously ill is also reprobated as cruel and unusual punishment. The evidence convinces us that prisoners in the Jackson County jail were constantly exposed to both violence and disease.

### D. Confinement of Pretrial Detainees

■ Under both the Ledbetter and Diamond regimes, pretrial detainees and convicted persons were confined together and treated alike. The confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such a practice is "reasonably related to the institution's interest in maintaining jail security," *Bell v. Wolfish*, 441 U.S. 520, 531, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447, 468 (1979), or physical facilities do not permit their separation. *See Barnes v. Virgin Islands*, 415 F.Supp. 1218, 1235 (D.V.I.1976); *Hamilton v. Landrieu*, 351 F.Supp. 549, 552 (E.D.La.1972). Of course, if a particular pretrial detainee has a long record of prior convictions or is likely to be violent, imposition of greater security measures is warranted by the *Bell v. Wolfish* criteria. Nonetheless, pretrial detainees have a due process right to be considered individually to the extent security and space requirements permit. The defendants have failed to satisfy their constitutional duties in this regard.

### E. Administration of Discipline

■ Prisoners were confined to the "padded cell" as a disciplinary measure without any kind of hearing by Jailer Tootle during the Diamond administration. After Sheriff Ledbetter took charge, the principal disciplinary punishment was denial of visitation. However, even in the Ledbetter regime no disciplinary proceedings were conducted prior to the imposition of punishment, and the rules were so inadequate for prisoner guidance that the district judge found it necessary to order the posting of written rules prescribed by him. The practices of the two sheriffs violated the prohibition of disciplinary punishment without due process. *See Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

### F. Mail—First Amendment Rights

■ The evidence satisfies us that, prior to 1976, prisoner mail was opened and censored whenever Sheriff Diamond and Jailer

Tootle chose. During the Ledbetter administration, mail inspection and censorship appears to have been less pervasive. However, under both administrations the handling of prisoner mail violated the first amendment rights of prisoners. *See Guajardo v. Estelle*, 580 F.2d 748 (5th Cir. 1978).

## V. INJUNCTIVE RELIEF

When this suit was filed in 1973, conditions in the Jackson County jail violated the federal constitutional rights of both convicted prisoners and pretrial detainees. During the four years prior to the time the district court heard this suit for an injunction and while every claim was being "hotly contested" by the defendants, as their counsel frankly stated to the court, some of the worst abuses were ameliorated. However, even when the trial was finally held, jail operation still violated some constitutional requirements.

This is the fourth time the case has been heard in this court. It is now contended that the need for an injunction has been obviated because a sanitary new jail, complying with LEAA standards, has been occupied. This happened after more than five years of litigation, more than two years after the appeal was filed and months after the panel heard oral argument.

■ Changes made by defendants after a suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended. *See Allee v. Medrano*, 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566, 577–78 (1974); *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303, 1308 (1953); *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974). The burden is on the defendants to prove that the wrongs of the past could not reasonably be expected to recur. *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344, 348 (1968).

The record of defendants' performance permits us to draw no such conclusion, and the improvement in conditions in February 1979, after five and a half years of litiga-

tion, does not eliminate the need for an injunction. The provision of a new and sanitary building does not assure that it will be operated in a constitutional way. Filth can accumulate in new buildings (the old jail was less than thirty years old when this suit began); new buildings can be made intolerably overcrowded; racial discrimination can be worked in immaculate corridors; due process can be denied antiseptically; and the first amendment can be abridged in the cleanest quarters.

■ Because nothing in the record provides any comfort to the plaintiff class or any assurance to this court that the results of the almost seven-year litigation will not be lost and the wrongs of the past will not be recommitted, we deem the issuance of an injunction necessary.

### A. Racial Segregation

Although the court must not assume superintendence of the details of jail management, the injunction must prevent recurrence of those abuses that caused confinement to violate constitutional rights. The new jail has one cell for each inmate at present. The parties stipulated that prisoners there are not segregated by race. However, for the reasons stated and because we do not order a one-prisoner-one-cell rule, an injunction against any kind of racial discrimination, overt or by any pretense, shall be issued.

### B. Overcrowding

It is evident that the physical facilities in the new jail will provide sufficient space for prisoners even if there is not one cell per prisoner, so long as the jail does not become grossly overcrowded. However, we cannot shut our eyes to the possibility that conditions at Parchman may not be speedily remedied and the new jail may become inundated by an increase in the number of state prisoners. Moreover, because the old jail is still being used for prisoner confinement, although allegedly for short terms, there is no assurance that conditions there have been improved or that an increase in prisoner population may not induce the defendants to resume using it.

The defendants have manifested indifference to the problem of overcrowding as well as other conditions seriously affecting the health and safety of inmates. Mindful of the mandate of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), we set no space standards. However, we direct the district judge on remand, after considering any evidence that may be offered by either party, to set a maximum number of prisoners who may be confined in the new jail at any one time and to enjoin the confinement of any greater number. The injunction shall also set a limit on the number of persons who may be confined at any one time in the old jail. It shall require adequate jail supervision in both jails by persons who are not jail inmates. The order may contain an express provision that the district judge may, upon a proper showing, permit exceptions to the maximum allowable number for stated brief intervals on a proper showing of grave public emergency.

C. Classification

In order fully to eliminate punishment of pretrial detainees and cruel and unusual punishment of all prisoners, the district court shall order the defendants to institute and operate a reasonable classification system for those confined in both the old and new jails. Offenders who are likely to be violent and dangerous or who are suffering from contagious diseases shall be separated from other prisoners. Pretrial detainees shall be classified and separated from convicted persons to the extent reasonably possible, except where detention in the same cell is required for institutional security. So long as cells are used for only one occupant, this requirement will be satisfied. However, because we have not restricted the defendants to a one-cell-per-prisoner rule, and because the defendants continue to use the old jail, an injunction is necessary to assure future compliance with constitutional requirements. A classification system meeting the requirements of Mississippi law applicable to convicted persons is adequate, Miss.Code Ann. § 47–5–103 (Supp.1978), so long as provision is made for pretrial detainees in accordance with the above standards. See *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

D. Disciplinary Rules

Although the stipulation shows that disciplinary rules, apparently adequate, have been promulgated for the new jail, the injunction shall forbid disciplinary punishment except in conformity with the due process and other requirements of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The stipulation contains a copy of the rules governing for the inspection of incoming and outgoing mail that were adopted upon occupancy of the new jail. These rules may meet the requirements of *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir. 1978), in which we set forth the scope of restrictions on free speech that might constitutionally be imposed on prisoner mail. However, because the plaintiffs have not yet had a full opportunity to challenge the rules concerning discipline and mail, either facially or as applied, the injunction shall prohibit all interference with mail save as warranted by rules adopted in accordance with *Guajardo*, and the plaintiffs shall be accorded an evidentiary hearing if conformity with *Wolff* or *Guajardo* is questioned.

E. Recreation

The plaintiff class has urged the court to require provision for exercise by prisoners confined in the County jail. The court is equally divided on this issue. Therefore, the trial judge's denial of this relief is affirmed. See, e. g., *United States v. Holmes*, 537 F.2d 227, 228 (5th Cir. 1976) (en banc) and cases cited therein.

## VI. CONDITIONS NOT COVERED BY INJUNCTION

A. Visitation Rights

Although visitations rights in the old jail were minimal, this was apparently necessary because of the overcrowded conditions and the lack of necessary facilities. We have held that for convicted prisoners "[v]isitation privileges are a matter

subject to the discretion of prison officials." *McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975). We have reserved the question whether convicted prisoners have a constitutional right to some form of visitation. *Martin v. Wainwright*, 525 F.2d 983, 984 n.3 (5th Cir. 1977).[12]

Because convicted prisoners are being accorded visitation rights, subject to reasonable security requirements, there is no need to consider whether deprivation of visitation would violate constitutional requisites.

The plaintiffs claim that pretrial detainees are entitled to more and that they have a constitutional right to personal contact with their families and loved ones, to touch and hold their children and their spouses. There can be no doubt that this is a natural human desire and that deprivation of it is serious. Three circuit courts have considered whether the Constitution requires such privileges to be accorded pretrial detainees. *See Jordan v. Wolke*, 615 F.2d 749 (7th Cir. 1980); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3d Cir. 1979); *Feeley v. Sampson*, 570 F.2d 364, 373 (1st Cir. 1978).[13]

The Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979), recognized that pretrial detainees' rights are determined by the due process clause. Physical contact may be denied them if it is a restraint "reasonably related to the institution's interest in maintaining jail security." 441 U.S. at 539, 99 S.Ct. at 1874, 60 L.Ed.2d at 468. Under the standards set in that case, contact visitation may be denied for legitimate security reasons applicable either to all detainees or only to particular individuals. Whether or not contact visitation rights should be accorded pretrial detainees in the Jackson County jail can be decided only after a full hearing on the facilities available in both jails and the security requirements in each.

In *Inmates of the Allegheny County Jail v. Pierce*, 612 F.2d 754 (3d Cir. 1979), the Third Circuit Court of Appeals affirmed the denial of contact visitation by the district court based on testimony that the primary reason for the ban on contact visits was to prevent the introduction of contraband into the jail, the absence of evidence that the prohibition was adopted for purposes of punishment, and its own conclusion that the prohibition under the circumstances prevailing in the Allegheny County jail "represented a reasonable choice by prison officials between alternative methods of protecting the legitimate security interests of the jail." 612 F.2d at 760. The Seventh Circuit, in *Jordan v. Wolke*, 615 F.2d 749 (7th Cir. 1980), reversed a district court order requiring the construction of new visiting facilities that would permit contact visitation. "Compliance would require not only construction of new visitation facilities but the hiring of additional guards." 615 F.2d at 749. The Court applied *Bell v. Wolfish* standards and reversed these requirements. It concluded, apparently as a legal matter, that the denial of contact visitation in the Milwaukee County Jail was "rationally related to the legitimate purpose of preserving prison security and order." 615 F.2d at 749.

What we require is an evidentiary hearing to which the *Bell v. Wolfish* due process standard may be applied. We reject only

---

**12.** If visitation rights are usually granted, they cannot be withheld as punishment without due process. *See Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Pretrial detainees must be allowed reasonable visitation privileges and this right may not arbitrarily be restricted. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Miller v. Carson*, 563 F.2d 741, 748–49 (5th Cir. 1977).

**13.** The Second Circuit, in *Marcera v. Chinlund*, 595 F.2d 1231 (2d Cir. 1979), also considered the question whether pretrial detainees have a right to contact visits and held that they enjoyed such a right. That decision, however, was remanded by the Supreme Court for consideration in light of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Marcera v. Chinlund*, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979). The Second Circuit, in turn, remanded the case to the District Court for the Western District of New York, where it is currently pending.

the Seventh Circuit's conclusion that we can ourselves determine the legitimate needs of a jail and the possible methods of permitting contact visitation.

**B. Medical Attention**

■ "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment," the Supreme Court, considering the rights of convicted persons, ruled in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260 (1976). The standard by which to measure the medical attention that must be afforded pretrial detainees has never been spelled out. The *Bell v. Wolfish* criterion, applied to medical attention, entitles pretrial detainees to reasonable medical care unless the failure to supply it is reasonably related to a legitimate governmental objective. The evidence does not persuade us that the trial judge was clearly erroneous in finding that the medical attention supplied was sufficient to meet the standards for both convicted criminals and pretrial detainees. Therefore, we see no reason to make express provision in the injunction regarding medical care.

**C. Diet**

■ The Constitution requires that prisoners be furnished reasonably adequate food. *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Mississippi law requires that prisoners shall be furnished "daily wholesome and sufficient food and drink," Miss. Code Ann. § 19–25–71 (1972). The jail diet consists mainly of starch and carbohydrates with few vegetables or fruits. It was likely dull, but the evidence does not persuade us that the deprivation has been so serious as to require an express injunctive provision.

## VII. CLASS ACTION

The complaint made two separate allegations: (1) the defendants had acted or refused to act on grounds generally applicable to the plaintiff class, making injunctive or declaratory relief appropriate (the situation referred to in Federal Rule of Civil Procedure 23(b)(2)); and (2) questions of law or fact common to class members predominated over questions affecting individual members and a class action was superior to other available methods for fair and efficient adjudication (the situation referred to in Federal Rule of Civil Procedure 23(b)(3)). In our earlier opinion remanding the case for a hearing on class certification, we considered the case as if Rule 23(b)(2) certification were being sought, apparently because of the manner in which the case was argued. *See Jones v. Diamond*, 519 F.2d 1090, 1093 n.2, 1099–1100 (5th Cir. 1975). On remand, Jones sought class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure and urged that "the court exercise its jurisdiction and waive the giving of notice to the other class members at this time."

After certification of the class in February 1977,[14] the district court considered testimony by Marvin Jones, the class representative, and ten other persons who had been confined in the Jackson County Jail. The record did not make it clear whether this testimony was being offered in support of the general relief sought for the entire class or as a basis for individual damages claims, or both. After the trial was completed, the plaintiffs filed a motion to amend the pleadings to conform to the testimony by adding the following: "Defendants have perpetrated or permitted to be perpetrated a pattern or practice of assaults and batteries upon inmates at the Jackson County jail in contravention to Mississippi State law. Defendants are liable for *same*, due to their negligence. *See Farmer v. State of Mississippi* [224 Miss. 96, 79 So.2d

14. Certification of a 23(b)(3) class would have presented questions of manageability, including the requirement that notice be given to the more than 8500 persons in the putative class. We express no opinion concerning the proper resolution of such questions. The issue of the propriety of such a class action was not presented to the district court and was not raised in the plaintiff's initial appeal. Therefore, we consider it not now before us.

528 (1955)]." This was granted by the district court. However, the record contains no motion to consider these individual claims under Section 1983 or as incident to the class action. Judgment was later rendered rejecting the damage claims of all of the plaintiffs without any qualification and without naming the persons affected. The judgment does not state whether it denies recovery only on pendent claims or also adjudicates Section 1983 claims.

It is urged that we consider the individual Section 1983 and state law damage claims of these persons as being before us incident to the 23(b)(2) class action. *See Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1775, at 23 (1972 & Supp. 1978); 3B Moore's Federal Practice ¶ 23.-40[4], at 304–09 (2d ed. 1979). They were not presented in this light to the trial court. We, therefore consider them on the basis set forth in the post-trial amended complaint, as pendent claim under Mississippi state law.

## VIII. DAMAGE CLAIMS

A. Liability of Board of Supervisors

■ Under Mississippi law, the Board of Supervisors is charged with providing a jail and is required to keep it in "good repair," Miss. Code Ann. § 19–3–41 (1972). It must take measures necessary to "secure inmates" against "sickness and infection," and periodically examine the safety and sufficiency of the jail and have it cleaned. *Id.* § 19–5–1 (1972). We do not here determine the possible liability of the Board of Supervisors for damages under Section 1983. Under Mississippi law "any neglect or failure in the exercise of its powers or in the discharge of its duties is the default of the board and not of the individuals composing it, and they are not liable for such neglect or default unless expressly made so by statute." *Roberts v. Williams*, 456 F.2d 819, 830 (5th Cir.), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971) (quoting *Wray v. McMahon*, 182 Miss. 592, 182

So. 99 (1938)). Because no statute has been cited to us imposing liability on the Board members, there is no action against the Supervisors for damages under Mississippi law. *See Roberts v. Williams*, 456 F.2d 819, 829–30 (5th Cir.), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971).

B. Liability of Sheriff

The sheriff, as custodian of the prisoners and operator of the jail, must "preserve the . . . prisoners . . . from any injuries or attacks" and keep the jail in a "clean and comfortable condition," Miss. Code Ann. § 19–25–69 (1972), and, as jailer, provide "daily wholesome and sufficient food and drink," proper lighting and "sufficient and clean bedding" for all inmates. *Id.* § 19–25–71. In addition, the sheriff has the duty to obtain sufficient guards to protect and secure any prisoner lawfully in his custody. *Id.* § 19–25–75.

■ Mississippi law imposes a duty on sheriffs and jailers having custody "to exercise ordinary and reasonable care, under the circumstances of each particular case, for the preservation of [a prisoner's] life and health. This duty of care is one owing by him to the person in his custody by virtue of his office . . . ." *Farmer v. State*, 224 Miss. 96, 105, 79 So.2d 528, 531 (1955) (quoting *Indiana ex rel. Tyler v. Gobin*, 94 F. 48, 50 (1899). In adopting the prevailing standard, the Mississippi Supreme Court *expressly* rejected a minority view providing a lower standard of care:

> The authorities are not unanimous in upholding liability in a case like this but they are numerous. *See Clark v. Kelly*, 101 W.Va. 650, 133 S.E. 365, 46 A.L.R. 799; Annotations 14 A.L.R.2d 353, et seq. Mississippi seems to have heretofore aligned itself with those jurisdictions which hold liability of the sheriff and his surety in a case of this nature.

*Id.* at 105, 79 So.2d at 531. Under this "ordinary and reasonable care" standard, a prison official is expected to take adequate measures to ensure the safety of prisoners: "[H]e cannot be charged with negligence in

failing to prevent what he could not reasonably anticipate, but he is responsible for the consequences of his own neglect." *Roberts v. Williams*, 302 F.Supp. 972, 986 (N.D.Miss. 1969), *aff'd*, 456 F.2d 819 (5th Cir.), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971).

This court has recognized and applied the Mississippi "ordinary and reasonable care" standard in two significant decisions. In *Mississippi v. Durham*, 444 F.2d 152, 157 (5th Cir. 1971), we held that a sheriff under Mississippi law "cannot escape his responsibility to take reasonable care of prisoners in his custody by simply making a casual examination of one who obviously needs medical attention . . . ." In *Roberts v. Williams*, 456 F.2d 819, 823 (5th Cir.), *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971), we reaffirmed that *Farmer v. State* is the law of Mississippi and imposes a duty of reasonable care on prison officials. Of course, Sheriff Ledbetter and Jailer Broadus are not liable for acts committed during Sheriff Diamond's administration. The liability of each defendant must be separately established.

### IX. THE INDIVIDUAL CLAIMS

Marvin Jones and the ten other individuals seek damages for personal injuries. Jones's claims arise out of his disciplinary confinement, one prisoner alleges an attack by a deputy and the other prisoners have claims stemming from the defendants' alleged failure to provide reasonable security against assaults by other inmates.

Marvin Jones testified that in 1973 a trusty dropped his breakfast tray on the floor and spilled his food. Jones became angry, threw the tray on the floor and refused to clean up the mess. He testified that, without notice of disciplinary action or a hearing, Jailer Tootle confined him to the "padded cell," which had no mattress or padding, for a period that Jones said was two days and Tootle said was one. When he was released from the cell, Jones complained of pain in his right foot and hip, soreness of the left shoulder and arm and inability to move his right leg or left arm.

There was, however, medical testimony that Jones was not suffering from any injury at the time of later medical examinations. There was also testimony contradicting Jones' version of the episode and depicting him as a disorderly and violent prisoner.

■ Whether disciplining Jones without a hearing was a denial of due process, *see Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed. 252, and whether requiring him to sleep on a concrete floor without bedding in the "padded cell" may have constituted cruel and unusual punishment, we need not now decide. The nature and extent of the injuries, if any, that he suffered were disputed, and we cannot find that the trial judge was clearly erroneous in his determination that Jones failed to prove any injury for which he is entitled to compensatory damages. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252.

The claims of the other prisoners stem from attacks by inmates, or, in one case, from an assault by a jailer. The trial judge considered each of these claims but concluded either that there was insufficient, uncorroborated evidence that the incidents occurred or that the facts did not support a finding of negligence on the part of prison officials. The claims involved are those of two persons who were juveniles at the time of the events complained of, Donald Overstreet, a pretrial detainee, and Darrell Ladnier, a convicted person, both of whom were attacked by another inmate while they slept; Darrell Glen McGee, a convicted individual who was stabbed by a fellow inmate; Bobby Hughes, incarcerated after being unable to pay a fine imposed for shoplifting, who was burned by several prisoners; and various other claims by Lowell Dean Mitchell, Anthony Miller, Robert LeClair, Larry Carver, Albert Johnson and Walter Hoie.

■ We have carefully reviewed the evidence presented on behalf of Lowell Dean Mitchell, Anthony Miller, Robert LeClair, Larry Carver, Albert Johnson and Walter Hoie. The decision that these persons did not prove a claim under Mississippi state law by a preponderance of the evidence is not clearly erroneous.

There was greater evidentiary support for the claims of Donald Overstreet and Darrell Ladnier, both of whom were confined during the Diamond administration. There was also evidence corroborative of the claims of Darrell Glen McGee and Bobby Hughes, who were confined after Sheriff Ledbetter was elected. Considering the state of the record on these claims and applying only Mississippi state law, we are unable adequately to determine whether the fact findings of the district court were or were not clearly erroneous.

Had these claims been presented under Section 1983, it would have been necessary to examine the nature of the right asserted,[15] to apply standards for liability under that statute,[16] to afford the defendants an opportunity to plead official immunity[17] and to assay the harm that resulted.

As we have pointed out, Sheriff Diamond is now deceased. To remand the four claims with potential validity for trial under state law principles alone would permit only a narrow adjudication that would unduly confine these plaintiffs and subject the defendants to a possible second suit based on Section 1983. Under all the circumstances, the interests of justice will best be served if the claims of these four persons are dismissed without prejudice to their reassertion either as state law or Section 1983 claims, and each individual is given leave to file new complaints based on his personal claims setting forth all bases for damages. Because these four parties were heard as witnesses in the present case, it shall be treated as suspending the operation of the statute of limitations, which shall commence to run anew on the issuance of our mandate.

**15.** *See, e. g., Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

**16.** *See, e. g., Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1970); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**17.** *See, Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

**18.** 42 U.S.C. § 1988 states in part:

## X.  ATTORNEYS' FEES AND COSTS

Counsel for plaintiffs are entitled to attorneys' fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988,[18] for the prosecution of this action, *see Morrow v. Dillard,* 580 F.2d 1284, 1300 (5th Cir. 1978), including services on appeal, *see Miller v. Carson,* 563 F.2d 741, 756 (5th Cir. 1977). Although the Act was passed after this litigation had commenced, its provisions embrace pending litigation and include compensation for services rendered in such suits prior to its adoption. *Hutto v. Finney,* 437 U.S. 678, 694–95 & n.23, 98 S.Ct. 2565, 2575–76 & n.23, 57 L.Ed.2d 522, 536–537 & n.23 (1978); *Robinson v. Kimbrough,* 620 F.2d 468, 474 (5th Cir. 1980); *McNamara v. Moody,* 606 F.2d 621, 626 (5th Cir. 1979) *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); *Rainey v. Jackson State College,* 551 F.2d 672, 676 (5th Cir. 1977), *aff'd and modified on rehearing,* 591 F.2d 1002 (1979). The fees are to be fixed in accordance with the criteria set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).[19]

"In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.'" S.Rep.No. 94–1011, 94th Cong. 2d Sess. 6, *reprinted in* [1976] U.S. Code Cong. & Ad. News, pp. 5908, 5913. Congress intended "that the amount of fees awarded under [the Act] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be

> In any action or proceeding to enforce a provision of [§ 1983 and other statutes] ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

**19.** See *Piambino v. Bailey,* 610 F.2d 1306 (5th Cir. 1980) (*Johnson* criteria apply to fees in class actions); see also *Brown v. Culpepper,* 559 F.2d 274, 277–78 (5th Cir. 1977).

reduced because the rights involved may be nonpecuniary in nature." *Id.*

■ In fixing the fee, the district court should be mindful that in complex civil rights litigation, and particularly in prisoners' rights cases, issues are overlapping and intertwined. In order to represent their clients adequately, attorneys must explore fully every aspect of the case, develop all of the evidence and present it to the court. Time spent pursuing unsuccessful claims that were clearly without merit should be excluded. However, the mere fact that the litigants did not succeed in obtaining a judgment on all of the claims asserted does not mean that time spent pursuing these claims should automatically be disallowed. *See Stanford Daily v. Zurcher,* 64 F.R.D. 680, 684 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir. 1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) [cited with approval in S.Rep.No. 94–1011, 94th Cong.2d Sess. 6, *reprinted in* [1976] U.S. Code Cong. & Ad. News, pp. 5908, 5913]. Instead the court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case.

■ No one *Johnson* criterion should be stressed to the neglect of others. However, because the fee in this case was contingent on success, it is appropriate for the court to consider *Johnson* criterion number six, "whether the fee is fixed or contingent." This reflects the provisions of the ABA Code of Professional Responsibility, DR 2–106(B)(8), and the practice of the bar. Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. This is neither less nor more appropriate in civil rights litigation than in personal injury cases. The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners.

## XI. EXPERT WITNESS FEES

■ The plaintiffs also seek reimbursement of fees paid for expert witnesses. The usual rule in civil litigation in federal courts is that such fees are not recoverable as costs, *Gerber v. Stoltenberg,* 394 F.2d 179 (5th Cir. 1968); 10 C. Wright & A. Miller, Federal Practice & Procedure § 2678 at 236–37 (1973), and experts are compensable only at the same rate as other witnesses. *See* 28 U.S.C. § 1821 (provision for compensation of witnesses).

■ Congress has manifested an intention that a different rule be applied in civil rights litigation:

> "If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate those rights in court."

S.Rep. 94–1011, 94th Cong.2d Sess. 2, *reprinted in* U.S. Code Cong. & Ad. News, pp. 5908, 5910. District courts in many instances have awarded the full fees of experts on the ground that their testimony and assistance were necessary or helpful in representing clients in civil rights litigation. *See e. g., Keyes v. School District No. 1, Denver, Colorado,* 439 F.Supp. 393, 418 (D.Col.1977); *Pennsylvania v. O'Neill,* 431 F.Supp. 700, 713 (E.D.Pa.1977), *aff'd mem.,* 573 F.2d 1301 (3d Cir. 1978); *Wallace v. House,* 377 F.Supp. 1192, 1206–07 (W.D.La.1974), *modified,* 515 F.2d 619 (5th Cir. 1975), *vacated on other grounds,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976).

Counsel must have the assistance of experts to furnish effective and competent representation. In most civil rights litigation, and in prison cases in particular, expert testimony is a vital ingredient in the proper presentation and decision of a case. Without the ability to recover experts' fees, plaintiffs, particularly prison inmates who are almost always indigent, will be unable to bring these cases.

We therefore remand for determination of appropriate attorneys' fees and costs, including expert witness fees, under the standards set forth in this opinion.

## XII. CONCLUSION

Within thirty days after issuance of the mandate, the district court shall commence such an evidentiary hearing as it deems necessary to determine the maximum capacity of the new jail, and within fifteen days after that hearing it shall issue an additional order forbidding the confinement of more than that number of prisoners at any one time. The injunction shall also fix the maximum number of prisoners who may be confined in the old Jackson County jail. It may provide that, upon a showing of urgent necessity and serious public need, the defendants may, after notice to the plaintiffs, seek permission to confine a greater number of persons, for a period to be set by the court dependent on circumstances but not to exceed seventy-two hours.

At the same evidentiary hearing, the parties shall be accorded an opportunity to submit evidence concerning whether there is reason to deny contact visitation to pretrial detainees under the standards of *Bell v. Wolfish.* Within ten days after issuance of the mandate, the plaintiffs shall notify the district court whether they contend the new mail and disciplinary rules violate the *Guajardo* and *Wolff* standards respectively. If they desire to raise that issue, the hearing shall also embrace the questions thus raised.

Because the Jackson County jail has been operated in violation of constitutional standards, the trial court shall within thirty days after issuance of our mandate issue an injunction, consistent with the views expressed in our discussion in Part V above, commanding the defendants:

not to engage in racial discrimination in any form;

to provide for adequate jail supervision in the old and new jails by persons who are not jail inmates;

to institute and operate a reasonable classification system for those confined in both the old and new jails, with a provision for separation of pretrial detainees from convicted criminals and those other matters discussed in our opinion supra at page 1374;

to administer discipline only in conformity with the requirements of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); and

to regulate mail only in accordance with rules complying with *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978).

The judgment dismissing the individual damage claims of all of the plaintiffs, except Marvin Jones is modified so as to make it applicable only to pendent claims under Mississippi state law. The judgment is further modified so as to dismiss the pendent claims of Donald Overstreet, Darrell Ladnier, Darrell McGee and Bobby Hughes without prejudice so as to permit them to be filed and adjudicated together with their Section 1983 claims, the statute of limitations to commence to run only upon issuance of our mandate.

This summary conclusion is provided as a matter of convenience for issuance of the mandate. However, it does not limit or qualify the more extensive remarks in the text of the opinion.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

GODBOLD, Circuit Judge, specially concurring:

While I agree with much of Judge Rubin's opinion my approach to the case differs from his. I, therefore, set out my views in this separate opinion.

First, as to injunctive relief. The effect of the district court's order was to grant relief injunctive in nature, both prohibitory and affirmative, though not all injunctive in form, and the district court retained jurisdiction. So far as I can discern no member of the en banc court suggests that the trial judge erred in granting this relief.

The panel upheld injunctive relief and awarded additional injunctive relief. While the panel opinion has been vacated it remains significant because Chief Judge Cole-

man's concurring/dissenting en banc opinion adheres to what the panel held but then departs from it because he considers there has been a total change in circumstances. All of us recognize that there has been substantial change, and for the better, but I believe that the record does not show such total change in circumstances that we could properly dismiss this case or reverse or vacate the injunctive relief that was granted by the district court and so far as this record shows is at this moment still in effect.

With the case in this posture grant of injunctive relief by our court is appropriate. We merely build upon the injunctive order already in effect. Under this approach many of the details of conditions in the old jail in the early and mid-1970's are largely beside the point. Therefore, the differences of view over the evidence of these conditions and our review of this evidence need not be decided.[1]

It seems to me that with respect to injunctive relief our task is to determine the extent to which the relief already ordered by the district court should be broadened or supplemented because it was insufficient and the extent to which relief already ordered should be narrowed or eliminated because of changed circumstances. Necessarily these inquiries are net, not gross; we may see some relief that the district judge should have granted but that nevertheless need not be ordered now because changed circumstances have obviated the need for it.[2]

Applying the foregoing approach to the specific matters that Judge Rubin would include in an injunction, or would direct the district court to handle on remand, here is where I come out.

Racial discrimination: The trial judge granted limited relief. Judge Rubin would broaden it. I agree. The record does not show that racial discrimination has ceased in the new jail.

Adequate supervision by persons not inmates: The district judge did not order relief, there is no substantial dispute that supervision in the old jail was inadequate, the record does not show that supervision in the new jail is adequate. I agree that an order should issue.

Classification system and separation of pre-trial detainees and convicted criminals: There was no substantial classification system in the old jail and pre-trial detainees were not separated. The record does not disclose that these matters have been cor-

1. For example, we do not need to decide whether the old jail was filthy or clean in 1973. That decision is unnecessary to establish a predicate for injunctive relief in general. It is unnecessary as the basis for a specific order that the new jail must be kept clean because no one suggests such an order is necessary.

2. In a purist sense the erection of the new jail does not eliminate the need for an injunction, but in a practical way it greatly affects our en banc decision. For instance, while eschewing the effect of the new jail on whether to grant injunctive relief, Judge Rubin does not suggest injunctive relief against several conditions that he finds existed in the old jail. Actually, in this fourth appearance of an old case, on a stale record of facts many of which are years old, and with knowledge by the court that conditions have changed, but changed how much we do not accurately know, the court simply does the best it can. In many cases—such as school desegregation cases, racial composition of jury boxes, one-man one-vote, and election districting—where we are reviewing sweeping supervisory remedies relating to conditions that the court knows are subject to change and may have changed, we have required the parties to supply us with a "fresh record" containing the latest factual data that will assist us in determining whether relief denied below is presently necessary and if necessary what the remedy should be. Frequently this information has solely related to events and conditions after the entry of the judgment appealed from. But we have not hesitated to make the latest available facts the basis for a decision about injunctive relief and for design of a remedy if appropriate. We have taken this approach to avoid the possibility that either our decision or our remedy would not be adjusted to the realities of a situation to be governed by a sweeping remedial order.

The idea of a "fresh record" in this case is appealing. But the number and breadth of issues relating to the new jail in a physical sense and to the policies and methods of operating it would require extended hearings in the district court to build an up-to-date picture, further postponing effective decision of this case.

rected. The district judge granted no relief. We should.

Discipline: The district judge granted relief based upon what appear to me to be undisputed facts. Judge Rubin would supplement the relief. I agree. It is not shown that a new jail has eliminated this matter.

Mail: Constitutional violations are not disputed and it is not shown that they have been discontinued. Judge Rubin would grant injunctive relief. I agree that this is appropriate.

Overcrowding: The district judge granted partial relief of sorts. We do not know how crowded the new jail is or what the real possibilities are of its becoming overcrowded. I agree that the district court should, after taking evidence, set limits against overcrowding if it appears there is any substantial possibility of its occurring.

Contact visitation: Visitation rights in the old jail were nominal. The district judge granted no relief. The necessary facts about the new jail are unknown to us. I agree with Judge Rubin that this must be handled by the district court after hearing, keeping in mind security needs and availability of facilities.

Turning to issues other than injunctive relief, I agree with Parts VII, VIII, IX, X, and XI of Judge Rubin's opinion.

COLEMAN, Chief Judge, with whom AINSWORTH, CHARLES CLARK, RONEY, GEE, HILL, FAY, GARZA, HENDERSON and REAVLEY, Circuit Judges, join, concurring in part and dissenting in part:

The original (panel) opinion in this case is reported, 5 Cir., 594 F.2d 997.

The panel held that (1) the bull pens in the jail had been unconstitutionally segregated and this was to be enjoined; (2) visitation privileges for ordinary pretrial detainees should be set forth in written rules so that detainees may understand them and so that courts may have a definite basis for review in the face of claimed arbitrariness and capriciousness; (3) prison mail rights

had been settled by our decision in *Guajardo v. Estelle*, 5 Cir. 1978, 580 F.2d 748; (4) pretrial detainees are entitled to protection against unnecessary or unprotected contact with prisoners known to be violent or disturbed or infected with a contagious disease; (5) federal courts may intervene when jail officials fail to protect prisoners from homosexual attacks, personal violence, or unnecessary contact with the contagiously ill; (6) when a pretrial detainee is charged with an infraction of prison rules he should be informed of the infraction and an opportunity to demonstrate that he is not guilty; (7) attorney fees should be awarded the plaintiffs; and (8) overcrowding was enjoined.

I adhere to what the panel said on these topics, at the time it was said. Because a *total change of circumstances* has since intervened I respectfully dissent from the *en banc* opinion in those respects hereinafter set out.

I

CHANGED CONDITIONS—NO SURVIVING CONTROVERSY

For the Court to spend its *en banc* energies on a controversy which, in essence, no longer exists is an unusual judicial event, out of harmony with the indisputable Constitutional principle that if there is no controversy there is no case. This litigation was pursued contemporaneously with the combined efforts of Jackson County authorities and the taxpaying public to build and equip an entirely new jail at an entirely new location. The majority opinion (footnote 5) concedes that a new jail has been in use for nearly two years, since February 15, 1979. This jail provides single cell occupancy, with eighty square feet per prisoner. The opinion chooses not to mention the formal action of the Jackson County Board of Supervisors declaring that the County shall never again use the old jail unless necessitated by some unforeseen emergency. Four individuals are allowed the option of individually refiling their claims for damages. If the *en banc* Court wishes to

grant this option, and I do not disagree, the *en banc* opinion could well have been limited to that question while affirming the panel opinion in all other respects.

The *en banc* majority says, however, that "The burden is on the defendants to prove that the wrongs of the past could not reasonably be expected to recur" and "[T]he record of defendants' performance permits us to draw no such conclusion", concluding that "nothing in the record provides . . . any assurance to this Court that . . . the wrongs of the past will not be recommitted." [1]

The case would not be moot if the record supported those conclusions, *but what does the record say*?

The record establishes the sincere concern of the people and the duly constituted authorities of Jackson County for the welfare of prisoners. The old Jackson County jail, on the top floor of the courthouse, was built in 1949. In 1971 it was only twenty two years old, which is no advanced age for structures of this kind. Yet, the movement for the construction of a new jail was inaugurated that year. Half the cost of constructing and equipping the new jail, nearly a million dollars, was financed by the federal government. It was constructed, equipped and staffed in accordance with federal LEAA standards. It is operated according to standards, rules, and procedures prescribed by LEAA. It is to be doubted that a more modern jail facility can be found anywhere in the United States.

The majority opinion fails to credit the people and the authorities of Jackson County with the new jail and also chooses to overlook the following:

1. Except for Hinds County, in which the State Capitol is situated, Jackson County maintains the best county law library in the State for use by public defenders and others;

2. Jackson County instituted the first work release program in the State, by which convicted individuals can live away from the jail or penitentiary, spend their nights in a minimum security environment, work during the day and support their families, and make efforts to rehabilitate themselves by employment;

3. Jackson County, in cooperation with State authorities, instituted the first restitution center in the State, in which individuals convicted of crimes involving property rights may work and make restitution to their victims without being sent to jail or to the penitentiary;

4. The new prison program authorized a county bond issue of $800,000, approved at the polls. This provided the funds for a modern Juvenile Facility, opened in 1975, along with the new jail.

These facts conclusively negate an attitude of indifference for the welfare of prisoners and negates the notion that the officials of Jackson County can be expected to do right only if they are required to operate the new jail under the terms of a sweeping injunction.

## II

### INJUNCTIVE RELIEF IS NOT WARRANTED

There is not the slightest whisper that the jail now being used by Jackson County is in violation of Constitutional guaranties. Hence, this case, in principle, is exactly like the Dallas County (Texas) jail case decided a little over a year ago, *Taylor v. Sterrett*, 600 F.2d 1135 (5th Cir., 1979—Wisdom, Ainsworth and Roney, JJ.).

The Court pointed out that the objects sought to be accomplished in the original suit had been accomplished and that the conditions for which a remedy was sought had been remedied. Held: the trial judge should have granted the county's motion that the court decline to retain further jurisdiction of the case.

This decision was in keeping with the following precedents:

---

1. P. 1375.

Federal Courts do not sit to supervise state prisons. *Meachum v. Fano*, 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

An equitable decree should not go further than necessary to eliminate the particular violation which prompted judicial intervention in the first place. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977).

In achieving constitutional compliance no court is bound to invoke draconian measures, particularly when another course, less drastic and already initiated, seems more likely to produce results. *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir. 1979).

Courts must be wary to avoid obtrusively monitoring the conduct of prison officials and thereby encumbering the administration of prison affairs. *Newman v. Alabama*, 503 F.2d 1320, 1328 (5th Cir. 1974).

Prison authorities should not be required to maintain prison security with one eye on the subject and the other on the consequences of contempt, in which the District Court could convert a warden into a prisoner. *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

The majority opinion directs that the local prison officials shall be put under a sweeping injunction, governing the daily, routine operations of the jail.

Since the majority takes this position I can only remind Jackson County that there are well defined policies and procedures for the dissolution of injunctions, once they have been issued.

## III

### THE EN BANC COURT HAS RETRIED THE CASE AT THE APPELLATE LEVEL

In 1971, this Court declared:

This Court reviews cases, it neither tries nor retries fact issues. Thus we must not be understood as even intimating that we can engage in the fact-finding process at the appellate level.

*Hill York Corporation v. American International Franchises, Inc.*, 448 F.2d 680, 691 (5th Cir. 1971).

Apparently, the 1971 Court was wasting its time. In over fifteen years this is the first time, that I can recall, in which the Court makes its own credibility choices and findings of fact. This turn of judicial events is all the more disappointing because the majority opinion frankly concedes: "There was *absolute conflict* in the testimony about sanitary conditions (emphasis added)."

The Court is obviously well aware of what it is doing when it repudiates the findings of the District Court, made on conflicting evidence, after that Court had *seen* and *heard* the witnesses.

The District Judge filed 40 pages of factual findings. He found:

"The jail is in a generally good state of cleanliness and the burden of proof concerning the foregoing allegations was not met by the plaintiffs." (Findings, p. 10).

He found that the jail was reasonably free of insects or evidence thereof. There is no evidence of mice, rats, or vermin in the jail.

He found that each prisoner is provided a clean mattress, blanket, mattress cover, and sheet. Over a period of approximately eighteen months prior to trial, 718 new mattresses had been bought and put to use in the jail.

The majority opinion says (p. 1371) that:

"Photographs and other evidence satisfy us that the prisoners' account of the jail more accurately described conditions, *at least at the outset of the suit*, than the account by the sheriff and jailer and that the district court was clearly erroneous in reaching the conclusion it did." (Emphasis added.)

The Court relies heavily on the testimony of John Boone and an accompanying environmentalist who made a one day visit to the jail, February, 1977, solely for the purpose of getting ready to testify for the plaintiffs. On the basis of that one visit Boone testified that on that isolated occa-

sion, in his opinion, the jail was filthy, *inhumanly overcrowded* and unsuitable for the confinement of prisoners.

The cold record explodes Mr. Boone's credibility. It shows, without dispute, that on the day of Boone's visit the prison held twenty-one state convicts and 22 pre-trial detainees, against a bunk capacity of 76.[2] Furthermore, this was about two months after the prisoners rioted because their visitation privileges had been curtailed when the sheriff caught contraband being brought into the jail. These orderly members of the plaintiff class did only $30,000

worth of damage to the jail, putting it out of business for a *considerable time*.[3] The evidence showed that repairs to the jail had not been completed when Boone had his visit.

The difficulty with the Court's position is that Boone and Theodore James Gordon were not the only "experts" who visited the jail and thereafter testified.

### Dr. Allen Ault

Allen Ault, Ph.D., had been Warden and Superintendent of the Maximum Security Prison and Associate Commissioner in Geor-

---

**2.** In his prepared resume, filed with the District Court, plaintiff's Exhibit 82, Mr. Boone refers to himself as a public administrator, media executive, social worker, human services professional, penologist, ·and correctional change planner. A shortened version of the resume reads as follows:

> Was 55 years old. Held an undergraduate degree in sociology, a master's degree in psychiatric social work, and had done postgraduate work in mental health services and criminal justice management, and at the National Institute of Law Enforcement and Criminal Justice. He was organizer and founder of the "Campaign for Alternatives to Prisons". In 1951–1952, he was a prison guard at the United States Penitentiary in Atlanta. From 1952 to 1965, he worked as a parol officer, group psychotherapist, and case worker, as case supervisor, and as chief of the classification and parole department at Atlanta. In 1965–1966, he was Director of the Crime and Corrections Project of the Southern Regional Council. In 1969–1970, he was field representative, community relations services, United States Department of Justice. In 1970–1973, he served at Lorton and in Massachusetts.

Except for his time at Lorton and as Massachusetts Commissioner of Corrections, which includes Walpole prison, Mr. Boone had not been employed in jail administration, although he had had peripheral employment in prisons. According to his resume, Mr. Boone was Superintendent at Lorton, 1970–1972, and Commissioner of Corrections, Massachusetts, 1972–1973, but the resume also shows that he attended summer sessions at the University of California in 1972 and 1973 and that he was a Fellow at Harvard in 1972–1973. Since 1973 Boone had been with the National Campaign for Alternatives to Prisons, of which he was the founder. *Since 1974 he had been an employee of a television station in Boston.*

According to his sworn testimony, Dr. Ault had never heard of Boone, a Georgian like himself, until Ault was called by the Massachusetts Governor's Office, asking him to come to

the State and take over as Warden of Walpole Prison, where, said Ault, "they totally lost control and the state patrol had to go in and run the institution". Dr. Ault did not accept the invitation. When Mr. Boone testified, the previous February, he was not asked why he remained at Walpole for such a short time, or why he left, but the record does show that after he did leave in 1973 he was never again employed in, or in charge of, a prison of any kind.

The record contains the following interesting colloquy with Dr. Ault on the witness stand:

Q. Who was Warden of Walpole at that time?

A. I don't recall who was Warden but John Boone had been Commissioner and had just recently been fired. They then called me and inquired whether I'd like to be Commissioner of the Department of Corrections in Massachusetts.

BY MR. WALKER:

Object as to what he was told by other persons, Your Honor. I think this is hearsay.

BY THE COURT:

Sustained.

However, there had been no objection when the question was asked and after the answer was given there was no motion to strike it.

**3.** The majority opinion, Footnote 11, attaches significance to the fact that the exasperated sheriff referred to these rebellious destroyers of public property as jail birds, even though the majority disclaims any condonation for the rebellion. This is reminiscent of the speech which the famous liberal philosopher, John Stuart Mill, M. P., made in the British House of Commons, April 21, 1868:

> "What was formerly our chief secondary punishment—transportation—before it was abolished, had become almost a reward. Penal servitude, the substitute for it, was beginning, to the classes who were principally subject to it, to be almost nominal, so comfortable did we make our prisons, and so easily had it become to get quickly out of them".

gia, where he had been responsible for the operations of 19 state prisons and 35 county prisons, with 11,000 prisoners. In 1977 he was serving as Commissioner of the Mississippi Department of Corrections (penitentiary) and was a member of the Board of Directors of the American Correctional Association.

Dr. Ault testified. During the preceding six months, on *three* different occasions, in *unannounced* visits, Dr. Ault had inspected the Jackson County jail. On those inspections, Dr. Ault had found the jail to be clean, "probably as neat and clean as any jail I've observed". The prisoners were clean. He saw no evidence of rodents or insects. The jail was quiet, appeared to be orderly, and there was not a lot of commotion or chaos. He felt no high rate of tension in the jail.

*Timothy Wilson*

Timothy Wilson, a witness called by the plaintiff, was a photographer for the Pascagoula newspaper, where he had worked for 7 years. In 1971, one of their reporters had been put in jail. This was during the term of Sheriff Navarette, whose administration is not involved in this litigation but who was sheriff immediately preceding Diamond. The paper was trying to get the jail cleaned up, so Wilson went up and took 7 pictures of the condition of the jail *under Navarette*. These pictures, Exhibits 98 through 104, were introduced in evidence. Some of them were handed around at our *en banc* conference, under the apparently mistaken belief that they illustrated conditions under Diamond. In 1971, Wilson said, the jail facilities were pretty bad; holes in the walls, torn up lavatories, paint off the walls, mattresses torn up. Wilson had never seen a jail before, but this one "was a mess".

In 1972, after Diamond took office, Wilson had gone back and taken photographs which showed "vast improvement." There was "quite a change, a very nice cleanup, walls painted, everything looked pretty good." It "satisfied us as a newspaper."

Later, the defendants called Gary Holland, the Editor of the newspaper, as their witness. Shortly after Diamond took office, as a matter of investigation, Holland went unannounced to the jail and ate some of the food being issued to the prisoners. He found it to be very good. He had been in the jail a few times since, looked in on some of the inmates, talked with a few inmates. He had helped conduct religious services in the jail. He thought the jail was "crowded" but had not "seen anything necessarily unclean; seemed to be in pretty good shape."

I shall not extend this opinion to inordinate limits by summarizing the testimony of Sheriff Diamond (then fatally ill with lung cancer and probably not likely to swear a pack of lies in preparation for his encounter with his Maker), Jailer Tootle, Sheriff Ledbetter, Jailer Broadus (now dead) and others. The majority concedes that this testimony, if believed (which was the function of the District Court), exonerated the defendants.

What we have here is the classical situation of experts and other witnesses testifying on opposite sides of a case and contradicting one another on the witness stand. Somebody is mistaken. The resolution of conflicts of that kind, where credibility is involved, is always for the trier of fact and never for the appellate tribunal. In crediting the testimony of Mr. Boone and his associate, a vital part of which was erroneous on its face, and in discrediting the testimony of Dr. Ault and the officers, the majority abandons the time-honored rule and stands the appellate function on its head. It is somewhat ironical that the vehicle for such an event is a case which, in fact, has already evaporated.

Incidentally, Dr. Ault testified that the Jackson County prison authorities had talked with him about taking the state convicts to the penitentiary, but he told them he could not do it because an outstanding federal court order, affirmed by this Court, forbade it. The federal court order requiring that conditions at Parchman be upgraded to Constitutional standards was undoubt-

edly correct. Even so, Jackson County authorities must know, now, what it means to be ground between Scylla and Charybdis.

## IV

## CONTACT VISITATION

The majority opinion on this subject is a curiosity. It refrains from holding outright that pretrial detainees are constitutionally entitled to contact visitation. Instead, it directs that when this case returns to the District Court there shall be an evidentiary hearing in which the parties shall be accorded an opportunity to submit evidence concerning whether there is reason to deny contact visitation to pretrial detainees under the standard of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). This puts the burden on the jailer instead of the one seeking the privilege and is tantamount to holding that contact visitation for pretrial detainees is required by the Constitution unless the custodial officials can *establish* a good reason to the contrary.

In my opinion, contact visitation for pretrial detainees is not a right guaranteed by the Federal Constitution. It is a matter which is, and ought to be, left to the discretion of prison authorities who, not the courts, have the critical responsibility for maintaining prison security and good order, including the prevention of access to drugs and weapons.

Subsequent to *Bell v. Wolfish*, two courts of appeals have specifically decided this issue. The cases are *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3rd Cir. 1979), and *Jordan v. Wolke*, 615 F.2d 749 (7th Cir. 1980). In both cases the Circuit Courts of Appeals held that pretrial detainees do not have an unfettered right to contact visitation. The language of *Jordan v. Wolke* is particularly appropriate, 615 F.2d at 753–754:

> For similar reasons we believe that the denial of contact visitation by the authorities who operate the Milwaukee County Jail does not constitute punishment in a constitutional sense. Plaintiffs' sole complaint is that detainees are not allowed

physical contact with visitors during the relatively brief periods of their detention. Although the Court in *Wolfish* did not address the issue of contact visitation, *id.* at 559–60 n.40, 99 S.Ct. at 1885 n.40, it did chart the path on which analysis must proceed. First, that prohibition of contact visitation is not intended by the defendants as punishment is undisputed. Second, the prohibition is rationally related to the legitimate purpose of preserving prison security and order. As the Supreme Court said, the authorities "must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." *Id.* at 540, 99 S.Ct. at 1874. Finally, the prohibition of contact visitation is not "excessive in relation to the ... purpose" of maintaining security and order. *Id.* *Wolfish* itself sustained the validity of highly intrusive "body-cavity" searches of detainees that were performed as a matter of course after each contact visit. In approving these searches, the Court noted that an alternative to their use would be to "abolish contact visits altogether." *Id.* at 560 n.40, 99 S.Ct. at 1885 n.40. The Court thus recognized the dilemma of prison authorities. Some method must be employed to assure that weapons, drugs, and other kinds of contraband do not enter the jail. Where contact visitation is permitted, the Supreme Court has found it permissible to conduct body-cavity searches. Where no contact visitation is permitted, the searches are unnecessary. Neither alternative is so clearly preferable to the other that a court is warranted in substituting its judgment for that of "the persons who are actually charged with and trained in the running" of detention facilities. *See id.* at 560, 99 S.Ct. at 1886. Thus, under the standards prescribed in *Wolfish*, the Constitution was not offended.

The Second Circuit had the issue before it in *Marcera v. Chinlund*, 595 F.2d 1231 (1979). It held, 595 F.2d at 1237: "In sum, it is too late in the day to suggest that it does not offend the Constitution not to per-

mit pretrial detainees contact visits." The Supreme Court promptly granted certiorari, vacated, and remanded for further consideration in light of *Bell v. Wolfish*, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281.

As to any further hearing, the record indisputably shows that when Sheriff Ledbetter apprehended the introduction of drugs into the jail he began searching visitors for contraband, a permissible procedure, see *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Nevertheless, the prisoners rioted and wrecked the jail, to the tune of $30,000 in damages. Indeed, the repairs had not been completed when the designated "experts" for the plaintiff visited the jail in February, 1977, one of the causes for the delay being that the replacement of toilet bowls had to be accomplished by having them specially moulded.

When one notices that four convicts on death row in the Georgia penitentiary could, and did, escape by using hacksaws smuggled to them—when one notices that in another Georgia state prison eight convicts escaped, four of them convicted murderers—one realizes as a matter of sound judgment that prison security is not lightly to be undone, even by the federal judiciary. It is not uncommon for a pretrial detainee to be a murderer or a bank robber or a kidnapper, held on probable cause. The federal courts should restrain themselves from invading this area in the name of that Constitution which, at the outset, hailed domestic tranquility.

## V

### EXPERT WITNESS FEES

The majority opinion directs that upon remand the plaintiffs shall be allowed to recover expert witness fees. No Act of Congress is cited as authority for this proposition; indeed, there is none. Instead, the majority opinion relies on a Senate *Report* concerning legislation which could have contained such a provision, but *did not.*

The majority opinion lends no ear to what the Supreme Court, nearly fifty years ago, told us in *Henkel v. Chicago, St. P., M. & O. Ry. Co.*, 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932), which pointed out, in a unanimous opinion by Mr. Chief Justice Hughes, that from 1799 forward Congress had never authorized fees for expert witnesses in civil suits and held that Congressional legislation is controlling.

The Fifth Circuit has consistently denied recovery of expert witness fees in excess of that provided by 28 U.S.C. § 1821. *Baum v. United States*, 432 F.2d 85, 86 (5th Cir. 1970); *Gerber v. Stoltenberg*, 394 F.2d 179 (5th Cir. 1968); *United States v. Kolesar*, 313 F.2d 835, 837 (5th Cir. 1963); *Green v. American Tobacco Co.*, 304 F.2d 70, 77 (5th Cir. 1962).

There is no doubt that Congress could, and may yet, legislate on the subject of expert witness fees in civil cases, just as it has on the subject of attorney fees, but the inescapable fact is that it has not done so. That is immaterial, I suppose, for the Court now does so.

## CONCLUSION

On the topics, and for the reasons hereinabove set forth, I respectfully dissent.